IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| DALLAS GAS PARTNERS, L.P. | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-04-669 |
| | § | |
| PROSPECT ENERGY CORPORATION | § | |
| | § | |

## AMENDED REPORT AND RECOMMENDATION[1]

Before the Court is Defendant Prospect Energy Corporation's ("Prospect") Motion for Summary Judgment and Plaintiff Dallas Gas Partners' ("DGP") Motion for Leave to File Second Amended Complaint.  Having carefully reviewed the parties' briefs and the record in this case, the Court submits its Amended Report and Recommendation to the District Court.

## Background

DGP was formed pursuant to Texas law on July 20, 2004, under the name of MNW Acquisition, LLP.  Since MNW Acquisition also briefly went under the name of Gas Solutions Partnership II, LLP, as well as DGP, all references in the record to any of these entities are noted below as DGP.  DGP's general partner was a pre-existing partnership called MNW Partners, LLC, which consisted of three persons: Tom Muse, David Nelson, and Jeffrey Weiss. Its five limited partners included these three individuals plus Franklin Brinegar and James Langdon. MNW Partners possessed at least one asset that triggered the remarkably tangled events that gave rise to this litigation.  On May 7, 2004, MNW Partners had entered into a letter of intent to buy Gas

_____

[1]In light of Defendant's pending counterclaim, which is not ruled on here, this Amended Report replaces the Court's earlier Report recommending dismissal of this cause of action.

1

Solutions, Ltd., a gas processing plant located in Longview, Texas, for $25.5 million.  On July 29, 2004, DGP finalized the terms of the transaction and signed a Purchase and Sale Agreement with Gas Solutions.  DGP agreed to pay a non-refundable deposit of $500,000 by September 3 and to finalize the deal by paying the balance by September 23.

The record does not indicate what specific assets DGP had at the time, but they were clearly insufficient to meet this obligation.  DGP therefore approached potential lenders, one of which was Prospect.  The parties dispute the nature of the negotiations that occurred between them, but they eventually found common ground and signed a letter agreement on September 3.  DGP was assisted in this process by the investment banking firm of Friedman, Billings, Ramsey ("FBR"), a major force in the investment banking field, and the law firm of Akin Gump Strauss Hauer & Feld, LLP, one of the country's largest law firms.  David Nelson was himself a former partner in Akin Gump, and Langdon was a current partner.

Under the letter agreement, Prospect was to loan DGP $30 million to aid in buying Gas Solutions and related assets.  The agreement specifically made Prospect's obligation contingent on completing due diligence to its own satisfaction.  The agreement also specified that it did not constitute the final terms  between the parties, but it prevented DGP from soliciting offers from other lenders during the agreement period.  For a variety of reasons, Prospect decided that its own investigation into DGP and the deal yielded results that were unsatisfactory to Prospect. It consquently terminated the letter agreement on September 21, just two days before DGP was required to pay the balance of sums to close the deal.

A series of proposals and counterproposals between the two parties quickly ensued and culminated on a very busy September 23.  At DGP's suggestion, the two parties agreed that Prospect would pay DGP $2.5 million in return for the partnership's assignment of its interest in acquiring Gas

2

Solutions.  In addition, Prospect would pay the partnership's investment banking fees and would reimburse the partnership for the $500,000 deposit already paid to Gas Solutions.  Prospect would pay its own fees and expenses already incurred, and DGP would pay its expenses, except for the legal fees owed to Akin Gump.

For reasons that neither party addresses, DGP also apparently agreed to a rather complex reorganization of the partnership's structure to effectuate the sale.  All of DGP's limited partners signed a written consent that adopted a separate, written Assignment of Contract that assigned the right to purchase Gas Solutions to the general partner, MNW Partners.  The Assignment was attached as Exhibit A to the written consent.  Defendant's Motion, Ex. 12.  The written consent also provided that MNW Partners would resign as DGP's general partner and that Nelson would be the new general partner.

The sale itself was effectuated by a LLC Membership Interest Purchase Agreement ("the LLC agreement").  Id. at Ex. 11.  The three partners of MNW Partners – Nelson, Weiss, and Muse – sold their interests in MNW Partners to PEC White Oak, LLC, which Prospect owned.  The LLC agreement stated that Prospect would pay Akin Gump $3,295,000 "for the benefit of David W. Nelson for the account of Sellers."  It is undisputed that the money Prospect paid to Akin Gump was eventually divided by one means or another between the five members of DGP, not just the three partners of MNW Partners.      The agreement also included a lengthy mutual release agreement whose terms and scope are vigorously disputed by the parties.  Nelson, Weiss, and Muse, the partners in MNW Partners, all signed the LLC agreement.  Each of DGP's five limited partners (Muse, Nelson, Weiss, Brinegar, and Langdon) also separately signed a Consent and Agreement agreeing that: (1) DGP should assign its purchase contract to MNW Partners; (2) MNW Partners would transfer all of  its interest in the contract to Prospect; (3) MNW Partners would resign as general partner.  All five

limited partners also specifically agreed and ratified the mutual releases stated in the Purchase Agreement between Prospect and MNW Partners.  Prospect paid the money owed under the agreement.  Two months later, DGP filed the instant suit alleging fraud, breach of fiduciary duty, and tortious interference.

## Discussion

Prospect argues that the mutual releases set forth in the LLC agreement bar all of DGP's claims in this case.  DGP responds that the District Court has already ruled that the LLC agreement does not bind the parties.  This claim is without merit.  The District Court denied Prospect's Motion to Dismiss and alternative Motion to Transfer Venue, in part, because Prospect had not offered sufficient evidence to show that DGP was a party to the LLC agreement.  As stated above, the agreement was made between the three partners of MNW Partners (Weiss, Muse, and Nelson) but did not include references to DGP's predecessor, MNW Acquisition.  However, the Court did not hold, as a matter of law, that DGP is not bound by the LLC agreement.  It merely stated that Prospect had not carried its burden of proof to show that was the case at the time the Motion was presented to the Court, and it left open the possibility that further discovery would show differently.  The Court notes that Prospect has not renewed its argument that New York law governs this case, and both parties largely rely on Texas law to determine the issues at stake.

Plaintiff's argument, however,  raises the more serious issues of what relationship DGP and Prospect have to the LLC agreement and how it applies to them.  DGP first argues somewhat oddly that Prospect itself cannot invoke the release provisions of the LLC agreement because it was not a party to it.  It is undisputed that PEC White Oak is wholly-owned by Prospect and that the release agreement specifically names "Prospect Energy Corporation and each of its direct and indirect affiliates . . . subsidiaries, subdivisions . . ." as released parties.  Defendant's Motion, Ex. 11 at §

4

9(a).  A named party in a release agreement is entitled to its protections.  *McMillen v. Kingensmith*, 467 S.W.2d 193, 196 (Tex. 1971).

DGP next claims it is not bound by the LLC agreement because MNW Partners, not it, entered into it and was its beneficiary; DGP was not a third party beneficiary to the agreement; DGP was not connected to MNW Partners in any way at the time of sale; and Prospect fraudulently slipped the release provisions into the LLC agreement.  Response at 16.  DGP's argument essentially means that DGP's five limited partners chose to assign the partnership's valuable contract to MNW Partners for only $10 in consideration and with no other benefits in mind.  Taken seriously, this scenario means that Brinegar and Langdon were content to give up all their interests in the contract for virtually nothing and were also apparently willing to forego reimbursement for their share, if any, in the $500,000 deposit already paid to Gas Solutions.

The claim that DGP – represented as it was by two of the country's most sophisticated law and investment banking firms  –  was deceived by Prospect's wily manipulation into agreeing to the release provisions is clearly devoid of merit.  Emails between the parties show that signature pages for DGP's limited partners were sent from Prospect to DGP several hours before the agreement itself was finalized.  The exact time of signing is not apparent in the record.  However, late in the evening of September 23, Prospect's attorneys sent a revised version of the LLC agreement to Muse, Nelson, Weiss, four of its Akin Gump attorneys, and to its investment bankers.  The release provisions contained in Section 9 of the LLC agreement were not only part of this mailing, they were redlined and placed in bold, underlined typeface.  Defendant's Supplemental Response in Opposition to Amended Complaint at Ex. 2.

Prospect's email noted that this highlighted version of the revised agreement accompanied a clean draft so that the new version could be compared against earlier ones and stated that it "is subject

to the review and comments of all parties in all respects." Defendant's Motion at Ex. 18. Despite this invitation to read and comment on the revisions, however, neither Nelson nor DGP's lead attorney at Akin Gump ever read the LLC agreement before it was signed. Id. at Exs. 14 & 15. Nelson only read the documents approximately two weeks after signing them. Response at Ex. 56. DGP claims that the release agreements were fraudulently obtained because such releases are unusual, and Prospect knew DGP was busy drafting documents. Prospect's attorneys were no doubt also busy on September 23. Not surprisingly, DGP presents no case authority holding that a party is defrauded when it signs papers which neither it nor its counsel bothered to read and where those documents highlight and invite comment on the very provisions objected to.

Although neither party has explained why they decided at the last minute to channel the transaction through MNW Partners, overwhelming evidence in the summary judgment record shows that DGP was the intended beneficiary of the sale and was the real party in interest. Plaintiffs rely in part on affidavit testimony given by Nelson after the instant motion was filed that he received payment only in his capacity as a partner of MNW Partners. Nelson claims that after Prospect paid $3.95 million into an escrow account at Akin Gump, the three partners of MNW Partners made "gifts" to Brinegar and Langdon to make up for the fact that they missed out on MNW Partners' sale. Response at Ex. 22. (Presumably, Nelson, Weiss, and Muse also filed Form 706 Gift Tax Returns with the Internal Revenue Service for each gift in excess of $11,000). However, Nelson's earlier deposition testimony contradicts the claim that he was paid in his capacity as a partner of MNW Partners:

> Q:  And you did get your money, right?
> A:  I got the money that was provided for in the agreement, yes, my share of it.
> Q:  Your share as a partner in Dallas Gas Partners?
> A:  That's correct.

Plaintiff's Motion, Ex. 15 at p.287.  "[T]he nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly conflicts, without explanation, his previous testimony."

*Albertson v. T. J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984).  DGP's attorney also testified

that DGP was the intended beneficiary:

> Q:   And in fact, the money – the two and a half million dollars, plus the
> reimbursement of expenses, went to those five people [in DGP]; correct?
>
> A:  It was eventually – I am not sure all of it, but – much of it was distributed
> to the – to the limited partners.
>
> Q:  And it was distributed to them in proportion to their interests in [DGP];
> correct?
>
> A:   Should have been.
>
> Q:  The purpose of this transaction was for [DGP] to divest itself of the right
> to buy Gas Solutions and to get paid for that; correct?
>
> A:  The purpose – *the transaction was the sale indirectly of the contractual
> right to acquire Gas Solutions* in exchange for money and payments on behalf
> of the company.
>
> Q:  Yeah.  And the company you are referring to is DGP?
>
> A:  Correct.

Plaintiff's Motion, Ex. 14 at 230-31 (emphasis added).

The emails that closed negotiations on September 23 confirm this.  Prospect proposed to pay

$2.5 million for the contract, to pay the banker's fees, and to "reimburse MNW for its $500,000 which

has been applied to the purchase price."  Id. at Ex 10.  "MNW" here means MNW Acquisition [DGP]

since that entity owned the contract at the time of the emails, had paid the deposit, and had been in

negotiations with Prospect.  DGP's attorney responded that Prospect should wire the payments to an

escrow account for DGP.  Id.  Plaintiff has presented no evidence supporting the claim that the monies

were actually paid to an escrow account for MNW Partners and not the one referenced here for the

benefit of DGP.

As this evidence shows, there is considerable confusion in this case in how Plaintiff

distinguishes between MNW Partners and DGP.  Indeed, Plaintiff's own pleadings are at direct odds

with its current account of the roles DGP and MNW Partners played in this case.  Like the Original

Complaint (which also alleged that Prospect paid DGP directly), the First Amended Complaint

specifically alleges that "[DGP]'s limited partners . . . assigned their rights to purchase Gas Solutions

to *PEC White Oak*."  First Amended Complaint at ¶ 35 (emphasis added).  Technically, MNW

Partners did this, and PEC White Oak acquired the contract only by means of the very LLC agreement

to which DGP now claims it was not a party.  Even the LLC agreement itself confuses the two by

stating that MNW Partners is controlled by the July 20, 2004, partnership agreement.  Defendant's Ex.

11.  That agreement, however, established DGP; MNW Partners pre-existed it and had already entered

into the letter agreement to buy Gas Solutions.

        Nevertheless, the salient point in this dispute is quite direct: is DGP bound by the mutual

release agreements in Section 9 of the LLC agreement?  It is undisputed that all of DPG's limited

partners signed consents agreeing to the LLC agreement and that they were attached to the document.

Plaintiff argues that the signatories signed only in their individual capacities and not as limited

partners of DGP.  This is a puzzling claim since their only interest in the Gas Solutions contract was

*as* partners of DGP.  More importantly, the signature pages each clearly contain the heading:

"CONSENT AND AGREEMENT OF *LIMITED PARTNERS* OF GAS SOLUTIONS PARTNERSHIP

II. LP [DGP]".  Id.  The pages specifically refer to DGP's partnership agreement and highlight that the

signatures were given by DGP's limited partners:

> In addition, each *limited partner* of the Partnership agrees to and ratifies the
> provisions set forth in Section 9 of the foregoing LLC Membership Interest Purchase
> Agreement dated as of September 23, 2004.

Plaintiff's Ex. 11 (emphasis added).  Thus, the evidence clearly shows that DGP's partners signed

these pages in their capacities as limited partners and not in their "individual" capacities.  As such,

8

each of Plaintiff's partners agreed to the Section 9 release agreements.  As stated above, the claim that they were fraudulently induced into agreeing to Section 9 is meritless.

Plaintiff attempts to avoid the ramifications of Section 9 by claiming that the LLC agreement is not binding on it because its general partner, David Nelson, did not sign the agreement.  Nelson certainly signed the consent agreement attached to the LLC agreement.  Although the signature page does not specifically state "general partner," Plaintiff presents no caselaw holding that such specificity is required.  Equally important, it is extremely difficult to understand what purpose there could be in having all of DGP's limited partners submit signature pages consenting to the LLC agreement if the signatures were never intended to have any binding effect.

Even if Nelson did not sign as a general partner, Plaintiff's claim fails.  DGP's argument relies on the fact that its partnership agreement states that limited partners shall not be "allowed to take part in the management or control of the Partnership."  Defendant's Ex. 2 at Article IX.  Since none of the limited partners were given management powers, Plaintiff claims, their signatures to the LLC agreement cannot bind DGP.  However, both parties overlook the fact that Paragraph 9.1(c) of the partnership agreement gave Nelson the power DGP claims he lacked.  That provision states, in relevant part, that "[a] Limited Partner *who is not also a General Partner* shall not be  . . . allowed to take part in the management or control of the Partnership . . ."  Id. at 11 (emphasis added).  This clause clearly contemplates that one like Nelson, who was both a limited partner and the general partner, is excluded from the restrictions on which Plaintiff relies.  If this were not true, the partnership's language would be superfluous.  At a minimum, this provision allowed Nelson to act on behalf of the partnership without specifically naming himself as "general partner."  The Court therefore finds that the signature pages to the LLC agreement were intended to bind DGP to the terms stated therein and that they do so.

The release agreements at issue here specifically state that all the signatories to the LLC agreement released Defendant "from any and all claims, liabilities, demands . . . arising out of or relating to (1) the [Letter Agreement] and the transactions contemplated thereby . . ."  Plaintiff's Ex. 11 at § 9(a). Moreover, Plaintiff explicitly agreed not to file the instant suit:

> Each of the signatories hereto (. . . including without limitation, any parties acknowledging or consenting to this Agreement) . . . covenants not to institute, maintain or prosecute any action, claim, suit, proceeding or cause of action or [sic] any kind to enforce any of the MNW Released Claims . . .

Id.  Public policy favors the settlement of claims and the enforcement of releases. *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178 (Tex. 1997).  DGP does not even argue that Plaintiff's claims are not within the scope of the Section 9 releases, and they are therefore binding on DGP.

Also before the Court is Plaintiff's Motion for Leave to File Second Amended Complaint. DGP seeks leave to add four new parties to this suit, each of whom was an employee or affiliate of Defendant and played roles in the transactions between the parties.  DGP's proposed Second Amended Complaint does not allege any activity that would not be covered by the Section 9 releases, and each proposed defendant is covered by that agreement.  Since granting leave would not change the outcome of this case, the Court **RECOMMENDS** that Plaintiff's Motion be **DENIED**.

<u>Conclusion</u>

For the foregoing reasons, the Court **RECOMMENDS** that the Defendants' Motion for Summary Judgment (Instrument No. 35) be **GRANTED** and that Plaintiff's Motion for Leave to File Second Amended Complaint (Instrument No. 36) be **DENIED.**

The Clerk **SHALL** send copies of this Amended Report and Recommendation to the

10

Parties.  The Parties **SHALL** have until **January 16, 2006**, to have written objections, filed pursuant to 28 U.S.C. § 636(b)(1)(C), **physically on file** in the Office of the Clerk.  The Objections **SHALL** be mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553.  **Any Objections filed SHALL be contained in a written document specifically entitled "Objections to the Amended Report and Recommendation of the Magistrate Judge"**, which will then be forwarded to the District Judge for consideration.   Failure to file written objections within the prescribed time **SHALL** bar the aggrieved party from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

      **DONE** at Galveston, Texas, this _____15th_____ day of December, 2005.

 

                                        _____
                                        John R. Froeschner
                                        United States Magistrate Judge